## Case No. 14,248.

### TURNER'S CASE.

[1 Ware (83), 77; 2 Wheeler, Cr. Cas. 615.] [1]

District Court, D. Maine.  June 10, 1825.

SEAMEN—CHASTISEMENT—MASTER'S RIGHT TO ARREST DESERTERS—ABUSE OF POWER.

1. The master of a vessel has a right, by the marine law, to chastise a disorderly or disobedient seaman in a moderate and reasonable manner.

2. He may retake a deserting seaman, and confine him on board the vessel: and the authority given by the statute of 1790. c. 56 [1 Story's Laws. 102; 1 Stat. 131, c. 29], to arrest deserters by a warrant from a magistrate. does not supersede the authority which he has under the general maritime law.

3. A court of admiralty will not discharge a seaman from his contract. on account of a punishment by the master, unless in a clear case of an abuse of power.

Isaac Turner. a man of color. was on Monday, the 8th, brought before the district judge of the United States for this district, by habeas corpus, to the prison-keeper of the county of Cumberland. In the petition for the habeas corpus it was stated, that Turner was shipped as a seaman, or cook, on board the brig Effort. of Salem, Captain Miller, then lying at a wharf in the port of Portland, and that he had been confined on board the brig in chains attached to the leg, for several days and nights successively, until he had finally succeeded in filing them off. and made his escape; but that he was retaken and committed to the custody of the gaoler. The prison-keeper made his return that the prisoner was in his custody by virtue of a lawful warrant from a magistrate authorized under the law of the United States, issued against Turner as a deserter from the brig. on which he was apprehended and committed to prison.  It was admitted by Turner that he had been regularly shipped at Salem. as cook of the vessel; and that after the arrival of the brig at Portland. he had been absent three times successively in the evening, from the vessel; the first time, as it appeared, with leave.  That

on the second evening he absented himself without leave, and did not return until after breakfast on the following day; and that again, on the ensuing evening, he was absent without permission, and did not return until late in the following forenoon; when, according to the statement of the owner. who appeared to resist the application, the cook was brought on board by him with the assistance of a civil officer.  It appeared by the declaration of the owner, that the captain, by his direction, then caused a chain to be fastened to the cook's leg by a blacksmith, with an iron rivet above the ankle; and that the chain, which was of sufficient length to enable him to traverse the deck. was secured by a lock to an iron ring bolted into the deck.  It appeared that during the daytime, he was kept in this situation, confined to the caboose-house or galley, at his work as cook.  At night, his chain was unlocked, and secured, in a place particularly fitted up for him between the decks, so as to enable him to get in and out of his berth. but at the same time so as to prevent his escape.  He was kept in this situation alternately day and night for the space of from five to seven or eight days, by order of the owner; he considering it, as he alleged. more for the benefit of the cook himself, than to cause him to be committed to prison under the statute, at the expense of the cook himself, which he several times solicited. There was no proof. however, of any ill-treatment on the part of the owner or officers of the vessel, beyond what might necessarily arise or be inferred from these circumstances, except from the declaration of the cook himself that he was quite unwell during a part of the time; and that one night in particular. he suffered extreme pain from a disorder of the bowels. causing them to swell to a distressing degree. until he succeeded in rousing the mate to his relief.  He was not permitted to have communication with any person on shore. from an apprehension that they might assist him in escaping.  It was acknowledged by the cook that he finally contrived to file off the rivet round his leg. and made his escape from the vessel, as it appeared. during supper time; although he complained that his leg was so much galled as to prevent his escaping to any considerable distance.  He was retaken within a day or two after. on the warrant which has been mentioned;  and these circumstances appearing as thus stated, on the examination upon the habeas corpus. it was moved on his behalf. that he should be entirely discharged.

The ground assumed in support of this motion. in behalf of the prisoner, was that the mode of restraint and treatment practised in this instance. by direction of the owner. and protracted for such a period by the master', on board a vessel lying at one of the principal wharves in the port. was such an unauthorized exercise of the rights of

---

[1] [Reported by Hon. Ashur Ware. District Judge.  2 Wheeler, Cr. Cas. 615, contains only a partial report.]

the owner, and abuse of the power of the master, and involved such a violation of the mutual obligations subsisting between the parties to the contract, as to amount to a total rupture of the relation, and entitle the mariner to his absolute discharge. It was urged that it was an unwarrantable infringement of the right of personal liberty; and that the proper course to be pursued on such an occasion, was that prescribed by the statute of the United States, although other methods might be employed at sea, or in foreign ports, and especially in bringing home criminals and mutineers to justice. But in this case, it was contended to be a cruel and unusual punishment; that such a mode of securing a seaman, like a criminal, on the deck of a vessel, in chains and fetters, by the side of Long wharf, where the inhabitants of the town were daily passing and repassing, and where he was precluded from any intercourse with persons on shore to obtain relief, was a scandal in the eyes of the community; the spectacle apart, it was an evil example; and that the public sense of the country would revolt from the infliction of such an enormity on account of a simple breach of contract. That whatever the spirit of any foreign law might be, we were under a different dispensation of jurisprudence in the United States in respect to the sacredness of personal liberty; that the provision of habeas corpus was expressly intended to secure this right; and that the seaman was entitled to the peculiar protection of a court of admiralty jurisdiction.

C. S. Daveis, for petitioner.

WARE, District Judge. The ground on which the petitioner's counsel claims his discharge from the vessel, is the illegal punishment inflicted upon him, previous to his last desertion. After that desertion, he was apprehended on a warrant from a justice of the peace, in pursuance of the authority granted by the 7th section of the statute of the United States for the government of seamen in the merchant service, and it is not pretended that the imprisonment was illegal, unless the illegality of the previous punishment were such as to justify the desertion.

It is earnestly contended that the restraint on board the vessel by the authority of the master only, was without warrant of law, and in violation of the common rights of the citizen: that it was a justification of his subsequent desertion, and now entitles him to a discharge from his contract. It is certainly true that, by the common law, when a man lets himself to hire, and neglects or refuses to fulfil his engagement, he cannot be compelled to do it by any restraint put upon the freedom of his person. The law gives to the injured party only a remedy by an action for damages, and this is, in the ordinary transactions of life, considered an adequate remedy. But the contract of hire for marine service stands on reasons in many respects peculiar to itself. Though considered as a civil contract, principles are applied to it in some respects bearing a strong analogy to those holding in military service, and the service is, by the laws of some nations, considered, partially at least, as a military service. Seamen, if not bound by the general law of the sea, are by the positive institutions of several countries, to assist, at the risk of their lives, in defending the ship against pirates, and a refusal to fight is punished criminally. Such is the law of England (Abb. Shipp. 174); of France (Ord. de la Mar. Lib. 2. art. 9, § 7). The Consulate of the Sea (chapters 172, 178) requires all the seamen to provide themselves with arms for the defence of the ship, and if they do not, the master may provide them and deduct the price from their wages. The Laws of the Hanse Towns (articles 35, 36) condemn seamen who refuse to aid in defending the ship against pirates, to be whipped as cowards.

The present case presents an instance in which the remedy for a failure to fulfil the obligations of a contract has little affinity with the ordinary remedies given by the common law. A seaman who abandons the vessel is not considered merely as violating a civil obligation; he is branded as a deserter, may be apprehended on a warrant, and imprisoned, and forcibly compelled to fulfil his engagement. And this is a principle incorporated into all maritime codes. But what other contract, purely civil, can be enforced by such a process? Again, the master may compel an obedience to his orders by moderate and reasonable chastisement, on the spot, of a reluctant or disobedient seaman. But who ever heard, in any other contract for the hire of labor, of subduing obstinacy or quickening diligence, by corporal chastisement? Or who ever thought of offering, as a legal justification of a battery, that it was a necessary stimulant to the party of a more exact performance of his duty? Though the mode adopted by the master to secure the services of the cook may be revolting to the feelings of those who are in the habit of considering an action at law as the only remedy for a violation of a contract, these feelings will be considerably abated when they consider the difference of the principles applying to contracts for maritime services from those which govern ordinary contracts for the hire of labor, and the peculiar necessity of requiring a very exact compliance with the terms of the contract, for the security of property, often of great value, embarked on an uncertain and treacherous element, and singularly liable to accidents and losses. If a sudden tempest arises, the absence of a part of the crew may occasion the loss of ship and cargo, and the remedy by action would be a mere mockery of justice. The marine law, looking to these hazards, requires the seamen to be continually on board the vessel, and not to leave it but with the permission of the master, or in his absence, that of the next

officer. This is the uniform language of all the old ordinances. Consulat de la Mer. c. 166–169; Laws of Oleron, art. 5; Laws of Wisbuy, art. 4; Laws of Hanse Towns. 22, 40; 1 Valin, Comm. 549. They are particularly severe on those who spend the night on shore without leave. A seaman, says the Consulate of the Sea who sleeps on shore without the consent of the master, is guilty of perjury. Chapter 174. In the present case, Turner had twice absented himself without leave, during the night—a grave offence, as has been seen, in the eyes of the marine law. After the first absence he did not return, according to his own statement, until after breakfast. For this offence he was reprimanded by the master, and cautioned not to repeat the offence. No other correction was administered, and yet the next night he absented himself again, and did not return until he was brought back by persons sent by the captain in pursuit of him. The offence was not only here repeated on the first opportunity, but repeated without any excuse of preceding severity, and a disposition indicated of abandoning the ship altogether. What was the master to do? If will not be denied that he might justly chastise such repeated acts of disobedience and dereliction of duty. The authority of a master in maintaining subordination and discipline on board his ship, is likened to that of a parent over his child, or a master over his apprentice. Such disobedience, after being specially cautioned on the subject, it can scarcely be questioned, would justify moderate correction. Was there any thing in the mode of punishment adopted, repugnant to the general spirit and principles of the marine law? Valin, in his commentary on livre 2, tit. 6, art. 5, of the ordinance of Louis XIV., which prohibits seamen from leaving the vessel after she is laden, under a penalty of 100 sols, and of corporal punishment for a repetition of the offence, reviews the regulations of the ancient sea laws on this subject, and comes to the following conclusion: "From this it results that a seaman is always punishable who leaves the ship without permission, although the ship be not laden; but in this case he does not incur the penalty pronounced by this article. What may be done is to put him in irons, or a diet of bread and water for twenty-four hours, or he may be moderately flogged (recevoir quelques coups de garcettes), allowing on a second offence a little more rigorous punishment." If this be the law of the sea, and for this law what more respectable authority can be quoted than Valin, it will not be easy to show, from all the circumstances of this case, an excess of punishment. Every reasonable attention was paid to the comfort and accommodation of the man, consistent with his confinement. The chaining of a man to the deck of a vessel does indeed carry with it a harsh sound, and suggests to the imagination images of cruelty and suffering. But it does not appear that the mode of confinement was such as to give much bodily pain, for though some complaint of the kind is suggested now, none was made at the time, nor is there the smallest indication of a cruel and vindictive disposition on the part of the master. All appearances are directly the reverse. The only object appears to have been to secure the services of the cook on board the vessel, and prevent his being seduced to desertion by the officious and meddlesome interposition of persons on shore.

But it is argued that, admitting the right of the master thus to confine his men in proper cases, while he is in a foreign port, our statute providing for the apprehension of deserting seamen, by warrant, and their confinement in prison, supersedes the authority of the master under the marine law, at least while the vessel is lying in our own ports—that the law having fixed a mode by which the master may secure himself against the desertion of his men, he is confined to this remedy alone.

Several answers may, I think, be given to this argument. 1st. Admitting the law to be as is stated, it would not of necessity follow that Turner would be entitled to be discharged from his contract. It seems to me that there should be a clear case of abuse of authority, of punishment manifestly unjust or manifestly excessive, to justify the court in dissolving a contract deliberately entered into between the master and his men. If the punishment is illegal, it may give the seamen a right to an action against the master, for damages. But when the punishment is not clearly improper in the mode, or excessive in degree, and there is no reason to apprehend, as it is not pretended there is in this case, that it will be followed by unjustifiable harshness or cruelty on the part of the master, it does not appear to me that a proper case is presented for the interposition of the authority of the court in this form. 2d. It is not apparent that the legislature intended, in giving this remedy, to abridge the authority of the master in maintaining order and discipline among his crew, which he previously had by the marine law. 3d. The case above spoken of by the maritime law is not properly desertion, but such a leaving of the ship as does not amount to a legal desertion. And if, when Turner was brought on board after absenting himself from the ship the second night, he might legally be treated as a deserter, the master, for whose benefit the law was made, was not bound to consider him as such, but might proceed to enforce his authority and maintain the discipline of his ship's crew by the use of that discretionary power given by the general law of the sea.

On a view of all the circumstances, I do not think that the petitioner has made out a case which entitles him to be discharged from the vessel, and, as he was unquestionably a deserter when apprehended, he must be remanded to the custody of the prison-keeper.

TURNER'S CASE. See Case No. 16,778.